'08 CIV 3921

126-07/PJG/GMV/PLS
FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiff
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Peter J. Gutowski (PG 2200)
Gina M. Venezia (GV 1551)
Pamela L. Schultz (PS 8675)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

MARINIC SHIPPING COMPANY,

Plaintiff,

- against –

FIESTA INVESTMENTS LTD.

Defendant.

------------------------------------------------------------x

**08 CV    (    )**

**VERIFIED COMPLAINT**

RECEIVED
APR 25 2008
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, MARINIC SHIPPING COMPANY ("hereinafter "MARINIC") alleges, upon information and belief, as follows:

1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for the breach of obligations arising under an ocean bill(s) of lading and a maritime contract of charter party incorporated therein. This case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333, and this Court's federal question jurisdiction pursuant to 28 U.S.C. §1331 in that the action arises under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, codified at 9 U.S.C. §201 et seq. and/or the Federal Arbitration Act, 9 U.S.C. §1 et seq.

**The Parties**

2.    At all times material hereto, Plaintiff MARINIC was and still is a business entity duly organized and existing under the laws of the Marshall Islands with an agent in care of WEM Lines S.A., 152 Kifissias Ave. & Sohou Street, Psyhiko, 11525 Athens Greece.

3.    At all times material hereto, Defendant FIESTA was and still is a corporate business entity organized and existing under the laws of Delaware with a purported address at 3500 S. Dupont Highway, Dover, Delaware 19901.

4.    FIESTA, although technically formed as a Delaware corporate entity, lacks any true corporate existence or independence, and is instead controlled and dominated by Yuksel Yildirim, a Turkish national, and/or one or more his companies including Eti Krom A.S. ("Eti Krom"), Yilmar Shipping and Trading ("Yilmar"), Yildirim Holding A.S. ("Yildirim Holding"), Yildirim Dis Ticaret A.S. ("Yildirim Dis Ticaret") and/or other entities within the Yildirim Group.

5.    Absent a true and separate corporate existence, FIESTA is liable as an alter ego for the debts and obligations of, *inter alia*, Eti Krom, in respect to the claims set forth more fully below and in the action pending in this Court under Civil Action No: 07 Cv. 2215 (RJH).

**Events Giving Rise to the Underlying Claim – Fire Onboard the RM EVERAIM**

6.    On or about October 19, 2005 Plaintiff Marinic, in the capacity as owner of the M/V R.M. EVERAIM, an ocean going cargo vessel, entered into a maritime contract of charter party with T.K.B. Shipping A/S ("TKB"), as charterer.

7.    By charter party dated November 7, 2005, TKB in turn sub-chartered the vessel to Yilmar.  A true and correct copy of the sub-charter party is attached hereto as Exhibit A.

8.      On or about November 11-13, 2005, at Xingang, China, the vessel loaded a cargo of 49,098 metric tons of coal for carriage and discharge at two discharge ports on the Black Sea in Turkey.

9.      An order bill(s) of lading was issued for the carriage of the cargo, identifying Shenhua Coal Trading Co. Ltd. ("Shenhua") as the shipper, and Eti Krom as the "notify party", although Eti Krom was the true and actual intended receiver of the cargo. A true and correct copy of the bill of lading is annexed hereto as Exhibit B.

10.     The bill(s) of lading incorporated all the terms and conditions of the above referenced sub-charter party between TKB and Yilmar, including the clause requiring arbitration of any dispute and the application of English law.

11.     On December 9, 2005, while the vessel was sailing within proximity of the west coast of Turkey, an explosion was detected in the cargo and the crew discovered the coal cargo was self-combusting in the holds.

12.     The vessel diverted to the nearest anchorage, off Nemrut Bay, but the vessel was denied permission to berth at Nemrut Bay.

13.     Plaintiff Marinic undertook efforts to extinguish the ensuing fire and take such action as it could to prevent further cargo combustion. However, these actions proved unsuccessful and on December 10, 2005, Plaintiff entered into a salvage contract with the Turkish Coastal Safety Salvage Administration.

14.     The vessel was beached while fire fighting and salvage operations were carried out, which included lighterage of some 12,485 metric tons of cargo by salvors, which cargo was deposited in the Aliaga customs storage area.

15.    By December 26, 2005, the fire had been extinguished, and the vessel was refloated.

16.    Thereafter, the vessel was arrested by various interests, including the salvors and cargo interests.

17.    Security was provided by the Plaintiff Marinic, and the arrests were lifted on February 2, 2006, whereupon the remainder of the cargo was discharged ashore.

18.    The vessel then proceeded in ballast to the Yardgem shipyard in Turkey where extensive repairs were carried out.

19.    The fire was caused by the cargo's inherent propensity to self heat and/or susceptibility to spontaneously combust.

20.    Under the law governing the applicable contracts of carriage, there is an implied obligation not to load and/or ship dangerous cargo on a vessel without prior notice or declaration to the ship owner and/or carrier of the dangerous nature of the cargo.

21.    Plaintiff was not properly notified of the dangerous nature of the cargo, and thus did not consent to its carriage.

22.    Pursuant to Article IV(6) of the Hague/Hague-Visby Rules, the parties at interest with the shipment are liable for all damages and expenses directly or indirectly arising out of or as a result of the shipment of dangerous cargo to which Plaintiff had not consented with knowledge of its true nature or character.

23.    By virtue of the obligation imposed under the relevant common law and/or under the Hague/Hague Visby Rules and/or the applicable contracts of carriage, the shipment of cargo imposes an absolute warranty on the part of the parties to the shipment to properly declare the propensities of the cargo.

24.    The subject fire and casualty was caused by or arose out of the negligent and/or intentional actions by the parties to the shipment, including but not limited to Eti Krom, in its capacity as the actual and intended receiver, in failing to properly declare the characteristics of the cargo, all of which constitute a breach of the terms and conditions of the contracts of carriage, as well as a breach of the obligations, duties and absolute warranties imposed under applicable law, including but not limited to the Hague/Hague-Visby Rules.

25.    As a consequence of the foregoing casualty, damages and claims have arisen including claims for salvage operations, physical loss and damage to the vessel, fines, cargo damage, survey expenses, etc., and Plaintiff has and will continue to suffer losses in the total principal sum of $16,829,919.19, exclusive of interest, costs and reasonable attorney fees.

26.    Eti Krom has failed and/or refused to pay the damages resulting from the incident or otherwise secure the Plaintiff's claims.

27.    As noted above, and pursuant to clause 33 of the charter party and the bills of lading, all disputes arising thereunder are to be submitted to London arbitration with English law to apply and Plaintiff reserves its right to arbitrate the substantive matters at issue.

28.    This action is brought to secure jurisdiction and to obtain security in favor of Plaintiff in respect to the underlying claims against Eti Krom for which FIESTA is liable, as alter ego.

29.    Under English law, including but not limited to Section 63 of the English Arbitration Act of 1996, costs including attorney fees, arbitrators' fees, disbursements and interest are recoverable as part of Plaintiff's claim, and accordingly, this action is further brought to obtain security for additional sums to cover Plaintiff's anticipated attorney fees and costs in

the arbitration and interest, all of which are recoverable as part of Plaintiff's claim under English law.

30.    As nearly as can presently be estimated, Plaintiff's claim against FIESTA is calculated as follows:

A.    Principal claim:

| | |
|---|---|
| Salvage costs to CSSA (Turkish state salvors): | $ 2,800,000.00 |
| Salvage liability to Petkim (salvage interest): | $      27,500.00 |
| Salvage liability to Uzmar (salvage interest): | $      85,000.00 |
| Costs of Physical Repairs and Incidentals: | $10,152,052.19 |
| Claim for hire and detention: | $ 3,390,000.00 |
| Agency fees / disbursements at Aliaga: | $    184,285.00 |
| Consultant/Expert Fees: | $    191,082.00 |

B.    Estimated interest on the principal claim at 6.0% for three years:                                        $ 3,029.385.45

C.    Attorneys fees and other recoverable costs:           $ 1,993,043.00

                                                                           **$21,852,347.65**

## Basis for Claim Against FIESTA and Relief under Rule B

31.    As set forth above, FIESTA, as an alter ego of Eti Krom, bears liability and responsibility for the losses and damages described herein.

32.    FIESTA, although listed on the corporate register of Delaware as a Delaware corporate entity with an address in Dover, has no actual presence or office there, or anywhere in the United States.

33.    FIESTA has no officers, employees, directors or agents in Delaware, or anywhere in the United States.

34.    FIESTA's sole business presence is found in Turkey within the offices of, *inter alia*, Eti Krom and/or the other companies which comprise the Yildrim Group, all of which are

controlled and dominated by Yuksel Yildirim and from which he manipulates and dominates FIESTA.

35.    FIESTA has no independent telephone number, fax or email, and all communications to and from FIESTA are transmitted and/or received by or within the offices of Eti Krom and/or the other companies which comprise the Yildrim Group.

36.    FIESTA was created without adequate capital, and has been maintained without adequate capital - its financial wherewithal being controlled and manipulated by Yuksel Yildirim, Eti Krom (and/or the other companies which comprise the Yildrim Group), who determine what sums shall be placed in FIESTA's account/disposal and what sums shall be disbursed, without arms length consideration.

37.    Although FIESTA ostensibly engages in multi-million dollar purchase and sale transactions, it has at all times been under-capitalized, as it has no assets and issued only 1,500 shares with no par value.

38.    Eti Krom and Fiesta engage in the commingling of funds and FIESTA has admitted to the payment of Eti Krom debt.

39.    Eti Krom has admitted that it routinely leaves millions of dollars in Fiesta's account, for use in the payment of Eti Krom debt.

40.    Eti Krom and/or the other companies which comprise the Yildrim Group utilize FIESTA as a fictitious paying agent and corporate shell for the purpose of transferring title to goods they import into Turkey, principally coal, without any true arms length participation by FIESTA.

41.    FIESTA has a single director, Yuksel Yildirim, who also sits as director of Eti Krom, and who exercises complete dominion and control over FIESTA, including but not limited to its relationship with his other controlled companies including Eti Krom.

42.    The websites of the Yildirim Group have described FIESTA as a wholly-owned subsidiary of the Yildirim Group and as "the largest coal trader affiliated with the Group."

43.    In the transaction in issue, and at Eti Krom's/Yuksel Yildirim's direction, FIESTA was utilized as the entity who remitted the payment of the sub-freight which was due and payable from Yilmar to TKB, as outlined in paragraph 7 above.

44.    By virtue of the foregoing, FIESTA has no true corporate existence but is and should be considered as an alter ego of Eti Krom, and as such has responsibility for and liability for the debts and obligations of Eti Krom, including the losses and damages as set forth above flowing from the subject casualty.

45.    Upon information and belief, and after investigation, Defendant FIESTA cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant (collectively hereinafter, "ASSETS"), including but not limited to ASSETS, at, moving through, or within the possession, custody or control of banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;.

WHEREFORE, Plaintiff prays:

a.    That process in due form of law according to the practice of this Court may issue

against Defendant citing it to appear and answer the foregoing;

b.  That if Defendant cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendant up to and including the sum of **$21,852,347.65** including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or being transferred from or for the benefit of Defendant (collectively hereinafter, "ASSETS"), including but not limited to such ASSETS as may be held, received, or transferred in its name or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking institutions and/or such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein; and

c.  That the Court enter an order directing Defendant to appear and respond in the London arbitration as may be required given its status as an alter ego, or, to the extent an award is rendered against Eti Krom, to confirm that award as a judgment of this Court and retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary in order to give effect to the London arbitration; including but not entry of judgment thereon and enforcement against any funds or assets restrained hereunder; and

d.  For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: April 25, 2008
      New York, New York

                          FREEHILL HOGAN & MAHAR, LLP
                          Attorneys for Plaintiff

By: _____

                          Peter J. Gutowski (PG 2200)
                          Gina M. Venezia (GV 1551)
                          Pamela L. Schultz (PS 8675)
                          80 Pine Street
                          New York, NY  10005
                          (212) 425-1900
                          (212) 425-1901 fax

## ATTORNEY VERIFICATION

State of New York        )
                         ) ss.:
County of New York  )

PETER J. GUTOWSKI, being duly sworn, deposes and says as follows:

1.      I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.      The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or its solicitors.

3.      The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
/Peter J. Gutowski

Sworn to before me this
2 5 day of April 2008.

_____
Notary Public

HAZEL S. ROSENTHAL
Notary Public, State of New York
No. 01RO4641178
Qualified in Queens County
Certified in New York County
Commission Expires Dec. 31, 2010

# ORIGINAL

# Wonsild & Søn



| | RECOMMENDED<br>THE BALTIC AND INTERNATIONAL MARITIME CONFERENCE<br>UNIFORM GENERAL CHARTER (AS REVISED 1922 and 1976)<br>INCLUDING "F.I.O." ALTERNATIVE, ETC.<br>(To be used for trades for which no approved form is in force)<br>CODE NAME: "GENCON" | Part I |
|---|---|---|

**1.** Shipbroker

WONSILD & SON A/S, COPENHAGEN

**2.** Place and date

07 November 2005

**3.** Owners/Place of business (Cl. 1)

T.K.B SHIPPING A/S,
COPENHAGEN
*AS DISPONENT OWNERS*

**4.** Charterers/Place of business (Cl. 1)

YILMAR SHIPPING AND TRADING,
ISTANBUL

**5.** Vessel's name (Cl. 1)

mv RM EVERAIM

**6.** GRT/NRT (Cl. 1)

30661/17260

**7.** Deadweight cargo carrying capacity in tons (abt) (Cl. 1)

See clause 44

**8.** Present position (Cl. 1)

Xingang spot

**9.** Expected ready to load (abt.) (Cl. 1)

08 November 2005

**10.** Loading port or place (Cl. 1)

1/2 safe berth Xingang, always afloat

**11.** Discharging port or place (Cl. 1)

Safe port Marmara, no restriction, plus Samsun
where 10.50 meter brakish water draft restriction.
1 safe berth each discharge port

**12.** Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state "part cargo") (Cl. 1)

45,000 metric tons 10% moloo coal in bulk stowing about 49', to be loaded, carried and discharged in
strict conformity with IMO/IMDGC regulations/recommendations.

**13.** Freight rate (also state if payable on delivered or intaken quantity) (Cl. 1)

See clause 46

**14.** Freight payment (state currency and method of payment; also beneficiary
and bank account) (Cl. 4)

See clause 39

**15.** Loading and discharging costs (state alternative (a) or (b) of Cl. 5; also
indicate if vessel is gearless)

F.I.O.S.T

**16.** Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b).
If total laytime for load. and disch., fill in c) only) (Cl. 6)

a) Laytime for loading

See clause 20

b) Laytime for discharging

See clause 21

c) Total laytime for loading and discharging

**17.** Shippers (state name and address) (Cl. 6)

**18.** Demurrage rate (loading and discharging) (Cl. 7)

US$14,000 PDPR/DHD WTS BENDS

**19.** Cancelling date (Cl. 10)

09 November 2005

**20.** Brokerage commission and to whom payable (Cl. 14)

2.50% to the Charterers and 1.25% to Wonsild & Son A/S, Copenhagen on freight, deadfreight and demurrage

**21.** Additional clauses covering special provisions, if agreed.

Rider clauses 18 to 46 both inclusive as attached are to be incorporated in this Charter Party.

Adopted by
the Documentary Committee of the General
Council of British Shipping, London
and the Documentary Committee of The Japan
Shipping Exchange, Inc., Tokyo

Copyright, published by The Baltic
and International Maritime
Conference (BIMCO), Copenhagen

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include Part I as well as Part II.
In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

Signature (Owners)

*DISPONENT
OWNERS*

**T.K.B. SHIPPING A/S**

Signature (Charterers)



EXHIBIT

A

## PART II

### "Gencon" Charter (As Revised 1922 and 1976)

Including "F.I.O." Alternative, etc.

**1.** It is agreed between the party mentioned in Box 3 as Owners of the steamer or motor-vessel named in Box 6, of the gross/nett Register tons indicated in Box 3 and carrying about the number of tons of deadweight cargo stated in Box 7, now in position as stated in Box ix~ and expected ready to load under this Charter about the date indicated in Box 9, and the party mentioned as Charterers in Box 4 that:

The said vessel shall proceed to the loading port or place stated in Box 10 or so near thereto as she may safely get and lie always afloat, and there being a full and complete cargo ~~(if shipment of deck~~ ~~cargo agreed same to be at Charterers risk)~~ as stated in Box 12, ~~Charterers to provide all mats and/or wood for dunnage and any~~ ~~separations required, the Owners allowing the use of any dunnage~~ ~~wood on board if required)~~ which the Charterers bind themselves to load, and being so loaded the vessel shall proceed to the discharging port or place stated in Box 11 as ordered on signing Bills of Lading ~~or so near thereto as she may safely get and lie always~~ afloat and there deliver the cargo on being paid freight on delivered ~~or intaken quantity~~ as indicated in Box 13 at the rate stated in Box 13.

**B5/L** | AS PER DRAFT SURVEY

**2. Owners' Responsibility Clause**

Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by the improper or negligent stowage of the goods (unless stowage performed by shippers/Charterers or their stevedores or servants) or by personal want of due diligence on the part of the Owners or their Manager to make the vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied or by the personal act or default of the Owners or their Manager.

And the Owners are responsible for no loss or damage or delay arising from any other cause whatsoever, even from the neglect or default of the Captain or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this clause, be responsible, or from unseaworthiness of the vessel on loading or commencement of the voyage or at any time whatsoever. Damage caused by contact with or leakage, smell or evaporation from other goods or by the inflammable or explosive nature or insufficient package of other goods not to be considered as caused by improper or negligent stowage, even if in fact so caused.

**3. Deviation Clause**

The vessel has liberty to call at any port or ports in any order, for any purposes, to sail without pilots, to tow and/or assist vessels in all situations, and also to deviate for the purpose of saving life and/or property.

**4. Payment of Freight**         SEE CLAUSE 39

~~The freight to be paid in the manner prescribed in Box 14 in cash~~ without discount on delivery of the cargo at mean rate of exchange ruling on day or days of payment, the receivers of the cargo being bound to pay freight on account during delivery, if required by Captain or Owners.

Cash for vessel's ordinary disbursements at port of loading to be advanced by Charterers if required at highest current rate of exchange, subject to two per cent. to cover insurance and other expenses.

**5. Loading/Discharging Costs**

**(a)** Gross Terms

~~The cargo to be brought alongside in such a manner as to enable~~ ~~vessel to take the goods with her own tackle. Charterers to procure~~ ~~and pay the necessary men on shore or on board as the lighters to run~~ ~~the said cargo/vessel only hearing the cargo from the ship's rail.~~ ~~If the loading takes place by elevator, cargo to be put into in vessel's~~ ~~hold. Owners only paying trimming expenses.~~

~~Any extra under packages of cargo over two tons weight, shall be~~ ~~loaded,stowed and discharged by Charterers at their risk and expense.~~ ~~The cargo to be received by Merchants at their risk and expense~~ ~~alongside the vessel not beyond the reach of her tackle.~~

**(b)** F.i.o. and free stowed/trimmed

The cargo shall be brought into the holds, loaded, stowed and/or trimmed and taken from the holds and discharged by the Charterers or their Agents, free of any risk, liability and expense whatsoever to the Owners.

~~The Owners shall provide winches, motive power and winchmen from~~ ~~their Crew if requested and permitted; if not, the Charterers shall~~ ~~provide and pay for winchmen from ashore and/or cranes, if any. (This~~ ~~provision shall not apply if vessel is gearless and stated as such in~~ ~~Box 19).~~

* Indicate alternative (a) or (b), as agreed, in Box 15.

**6. Laytime**         SEE CLAUSE 19

**(a)** Separate laytime for loading and discharging

~~The cargo shall be loaded within the number of running days/hours~~ indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time actually used shall count. The cargo shall be discharged within the number of running hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time actually used shall count.

**(b)** Total laytime for loading and discharging

The cargo shall be loaded and discharged within the number of total running hours as indicated in Box 16 weather permitting, Sundays and holidays excepted, unless used, in which event time actually used shall count.

**(c)** Commencement of laytime (loading and discharging)

Laytime for loading and discharging shall commence at 1 p.m. if notice of readiness is given before noon, and at 6 a.m. next working day if notice given during office hours after noon. Notice at loading port to be given to the Shippers named in Box 17.

Time actually used before commencement of laytime shall count. Time lost in waiting for berth to count as laytime or discharging time, as the case may be.

* Indicate alternative (a) or (b) as agreed, in Box 16.

**7. Demurrage**         SEE CLAUSE 24

~~Ten running days on demurrage at the rate stated in Box 18 per~~ day or pro rata for any part of a day, payable day by day, to be allowed Merchants altogether at ports of loading and discharging.

---

**8. Lien Clause**

Owners shall have a lien on the cargo for freight, dead-freight, demurrage ~~and damages for detention.~~ Charterers shall remain responsible for dead-freight and demurrage (including damages for detention) incurred at port of loading. Charterers shall also remain responsible for freight and demurrage (including damages for detention) incurred at port of discharge, ~~but only to such extent as the~~ ~~Owners have been unable to obtain payment thereof by exercising~~ ~~the lien on the cargo.~~

**9. Bills of Lading**         SEE CLAUSE 39

~~The Captain to sign Bills of Lading at such rate of freight as~~ ~~presented without prejudice to this Charterparty, but should the~~ ~~freight by Bills of Lading amount to less than the total chartered~~ ~~freight the difference to be paid to the Captain in cash on signing~~ ~~Bills of Lading.~~

**10. Cancelling Clause**

Should the vessel not be ready to load (whether in berth or not) on or before the date indicated in Box 19, Charterers have the option of cancelling this contract, such option to be declared, if demanded, at least 48 hours before vessel's expected arrival at port of loading. Should the vessel be delayed on account of average or otherwise, Charterers to be informed as soon as possible, and if the vessel is delayed for more than 10 days after the day she is stated to be ready to load, Charterers have the option of cancelling this contract, unless a cancelling date has been agreed upon.

**11. General Average**         SEE CLAUSE 30 AND 33

~~General average to be settled according to York-Antwerp Rules~~ 1974. Proprietor of cargo to pay the cargo's share in the general expenses even if same have been necessitated through neglect or default of the Owners' servants (see clause 2).

**12. Indemnity**

Indemnity for non-performance of this Charterparty, proved damages, not exceeding estimated amount of freight.

**13. Agency**         SEE CLAUSE 35

~~In every case the Owners shall appoint his own Broker or Agent both~~ at the port of loading and the port of discharge.

**14. Brokerage**

A brokerage commission at the rate stated in Box 20 on the freight earned is due to the party mentioned in Box 20.
In case of non-execution at least ⅓ of the brokerage on the estimated amount of freight and dead-freight to be paid by the Owners to the Brokers as indemnity for the latter's expenses and work. In case of more voyages the amount of indemnity to be mutually agreed.

**15. GENERAL STRIKE CLAUSE**

Neither Charterers nor Owners shall be responsible for the consequences of any strikes or lock-outs preventing or delaying the fulfilment of any obligations under this contract.

If there is a strike or lock-out affecting the loading of the cargo, or any part of it, when vessel is ready to proceed from her last port or at any time during the voyage to the port or ports of loading or after her arrival there, Captain or Owners may ask Charterers to declare, that they agree to reckon the laydays as if there were no strike or lock-out. Unless Charterers have given such declaration in writing (by telegram, if necessary) within 24 hours, Owners have the option of cancelling this contract. If part cargo has already been loaded, Owners must proceed with same, (freight payable on loaded quantity only) having liberty to complete with other cargo on the way for their own account.

If there is a strike or lock-out affecting the discharge of the cargo on or after vessel's arrival at or off port of discharge and same has not been settled within 48 hours, Receivers shall have the option of keeping vessel waiting until such strike or lock-out is at an end against paying half demurrage after expiration of the time provided for discharging, or of ordering the vessel to a safe port where she can safely discharge without risk of being detained by strike or lock-out. Such orders to be given within 48 hours after Captain or Owners have given notice to Charterers of the strike or lock-out affecting the discharge. On delivery of the cargo at such port, all conditions of this Charterparty and of the Bill of Lading shall apply and vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.

**16. War Risks ("Voywar 1950")**

(1) In these clauses "War Risks" shall include any blockade or any action which is announced as a blockade by any Government or by any belligerent or by any organized body, sabotage, piracy, and any actual or threatened war, hostilities, warlike operations, civil war, civil commotion, or revolution.

(2) If at any time before the Vessel commences loading of cargo under this Charterparty it appears that performance of the contract will subject the Vessel or her Master and crew or her cargo to war risks at any stage of the adventure, the Owners shall be entitled by letter or telegram despatched to the Charterers, to cancel this Charter.

(3) The Master shall not be required to load cargo or to continue loading or to proceed on or to sign Bill(s) of Lading for any adventure on which or any port at which it appears that the Vessel, her Master and crew or her cargo will be subject to war risks. In the event of the exercise by the Master of his right under this Clause after part or full cargo has been loaded, the Master is at liberty either to discharge such cargo at the loading port or to proceed therewith. In the latter case the Vessel shall have liberty to carry other cargo for Owners' benefit and accordingly to proceed and load or discharge such other cargo at any other port or ports whatsoever, backwards or forwards, although in a contrary direction to or beyond the ordinary route. In the event of the Master electing to proceed with part cargo under this Clause freight shall in any case be payable on the quantity delivered.

(4) If at the time the Master elects to proceed with part or full cargo under Clause 3, or after the Vessel has left the loading port, ...

---

**T.K.B. SHIPPING A/S**

SHIPPING & TRADING

## PART II
### "Gencon" Charter (As Revised 1922 and 1976)
Including "F.I.O." Alternative, etc.

Jast of the loading ports. If more than one, it appears that further 205
performance of the contract will subject the Vessel, her Master and 206
crew or her cargo, to war risks, the cargo shall be discharged. If it 207
the discharge has been commenced shall be completed, at any safe 208
port in vicinity of the port of discharge as may be ordered by the 209
Charterers. If no such orders shall be received nam the Charterers 210
within 48 hours after the Owners have despatched a request by 211
telegram to the Charterers for the nomination of a substitute discharg- 212
ing port, the Owners shall be at liberty to discharge the cargo at 213
any safe port which they may, in their discretion, decide on and such 214
discharge shall be deemed to be due fulfilment of the contract of 215
affreightment. In the event of cargo being discharged at any such 216
other port, the Owners shall be entitled to freight as if the discharge 217
had been effected at the port or ports named in the Bill(s) of Lading 218
or to which the Vessel may have been ordered pursuant thereto. 219

(3) (4) The Vessel shall have liberty to comply with any directions 220
or recommendations as to loading, departure, arrival, routes, ports 221
of call, stoppages, destination, zones, waters, discharge, delivery or 222
in any other wise whatsoever (including any direction or recom- 223
mendation not to go to the port of destination or to delay proceeding 224
thereto or to proceed to some other port) given by any Government or 226
by any belligerent or by any organized body engaged in civil war, 226
hostilities or warlike operations or by any person or body acting or 227
purporting to act as or with the authority of any Government or of 228
belligerent or of any such organized body or by any committee or 229
person having under the terms of the war risks insurance on the 230
Vessel, the right to give any such directions or recommendations. If, 231
by reason of or in compliance with any such direction or recom- 232
mendation, anything is done or is not done, such shall not be deemed 233
a deviation. 234

(b) If, by reason of or in compliance with any such directions or re- 235
commendations, the Vessel does not proceed to the port or ports 236
named in the Bill(s) of Lading or to which she may have been 237
ordered pursuant thereto, the Vessel may proceed to any port as 238
directed or recommended or to any safe port which the Owners 239
their discretion may decide on and there discharge the cargo. Such 240
discharge shall be deemed to be due fulfilment of the contract of 241
affreightment and the Owners shall be entitled to freight as if 242
discharge had been effected at the port or ports named in the Bill(s) 243
of Lading or to which the Vessel may have been ordered pursuant 244
thereto. 245

(5) All extra expenses (including insurance costs) involved in discharg- 246
ing cargo at the loading port or in reaching or discharging the cargo 247
at any port as provided in Clauses 4 and 5 (b) hereof shall be paid 248
by the Charterers and/or cargo owners, and the Owners shall have 249
a lien on the cargo for all moneys due under these Clauses. 250



**17. GENERAL ICE CLAUSE** 251

*Port of loading* 252

(a) In the event of the loading port being inaccessible by reason of 253
ice when vessel is ready to proceed from her last port or at any 254
time during the voyage or on vessel's arrival or in case front sets in 255
after vessel's arrival, the Captain for fear of being frozen in is at 256
liberty to leave without cargo, and this Charter shall be null and 257
void. 258

(b) If during loading the Captain, for fear of vessel being frozen in, 259
deems it advisable to leave, he has liberty to do so with what cargo 260
he has on board and to proceed to any other port or ports with 261
option of completing cargo for Owners' benefit for any port or ports 262
including port of discharge. Any part cargo thus loaded under this 263
Charter to be forwarded to destination at vessel's expense but 264
against payment of freight, provided that no extra expenses be 265
thereby caused to the Receivers, freight being paid on quantity 266
delivered (in proportion if lumpsum), all other conditions as per 267
Charter. 268

(c) In case of more than one loading port, and if one or more of 269
the ports are closed by ice, the Captain or Owners to be at liberty 270
either to load the part cargo at the open port and fill up elsewhere 271
for their own account as under section (b) or to declare the Charter 272
null and void unless Charterers agree to load full cargo at the open 273
port. 274

(d) This Ice Clause not to apply in the Spring. 275

*Port of discharge* 276

(a) Should ice (except in the Spring) prevent vessel from reaching 277
port of discharge Receivers shall have the option of keeping vessel 278
waiting until the re-opening of navigation and paying demurrage, or 279
of ordering the vessel to a safe and immediately accessible port 280
where she can safely discharge without risk of detention by ice. 281
Such orders to be given within 48 hours after Captain or Owners 282
have given notice to Charterers of the impossibility of reaching port 283
of destination. 284

(b) If during discharging the Captain for fear of vessel being frozen 285
in deems it advisable to leave, he has liberty to do so with what 286
cargo he has on board and to proceed to the nearest accessible 287
port where she can safely discharge. 288

(c) On delivery of the cargo at such port, all conditions of the Bill 289
of Lading shall apply and vessel shall receive the same freight as 290
if she had discharged at the original port of destination, except that if 291
the distance of the substituted port exceeds 100 nautical miles, the 292
freight on the cargo delivered at the substituted port to be increased 293
in proportion. 294

**T.K.B. SHIPPING A/S**



ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN 07 NOVEMBER 2005
M.V. "RM EVERAIM"

# Wonsild & Søn

## CLAUSE 18

During currency of this Charter Party Owners confirm and warrant that

1) performing vessel has been classed by highest 1a1 class or equivalent society, full H+M insured and P and I covered  - yes
2) performing vessel has been originally constructed as a single deck bulk carrier and has clear , hoppered unobstructed main holds - yes
3) performing vessel is fully , completely workable, suitable for Charter Party cargo and intended voyage  - yes
4) holds/hatches/tanktops  to be clean, swept, dry, reduced & purified from ex cargoes and free of rust scales ,loose rust  - yes
5) performing vessel to supply light free of charge to Charterers for night working in holds  - yes
6) Charterers have right of using vessel gear, cranes, derricks free of charge with about 30 tons of lifting capacity. Crane drivers to be provided by Charterers at their expense. In case of continuous of breakdown more than 6 hours Owners to employ shore cranes which to be for their expenses and time - yes
7) vessel not to change her class, P and I, H+M company without Charterers written confirmation - yes
8) all time vessel has original valid certificates on board  and vessel has no objection to call ports  and trade to countries specified in this Charter Party. In case of any failure due to arising such kind of missing and Owners to be full responsible for all looses, expenses, delayings - yes
9) crew to be for under master command and employed with a bona fide trade agreement applicable to ITF - yes
10) vessel/Owners are not allowed to load any part cargo  - yes
11) all cargo to be loaded only under deck and no cargo to be loaded into deep tanks, top sides and/or any other inaccessible places   - yes
12) Charterers/shippers/receivers have right to use bulldozers/forklifts/winches/hubes/etc. to use in holds with weight not to exceed tank top strength  - yes
13) vessel has no deficiencies according to Paris and Black Sea and/or any other memorandums/regulations, and has no objection to call ports specified in this Charter Party.  In case of any failure due to arising from such kind of trouble than Owners to be fully responsible for all looses, expenses , delaying which will effect to Charterers' trading - yes
14) "vessel's gear serves to all hatches."  - yes
15) vessel has no bulkhead, centerline, longitude  separation, container fitting shoes and or any other obstructions - yes
16) vessel/Owners ISM fitted and approved by International approved society. In case of any failure due to ism regulation and other international regulations, Owners to be fully responsible for looses, expenses, delayings etc. whatsoever may arise - yes
17) holds/hatches/hatch covers  to be water tight/staunch and fully eligible for all cargo operations. - yes
18) vessel is fully suitable for grab operations - yes

## CLAUSE 19

NOR to be tendered via cable/vhf/fax/telex/phone within official working hours (Monday 08:00/Friday 17:00) upon berthing at load/discharging port and laytime start to count 12 running hours after NOR has been tendered any time day or night Sundays and holidays included unless sooner commenced. In case of congestion at berth then NOR to be

1

**Wonsild & Søn**

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN 07 NOVEMBER 2005
M.V. "RM EVERAIM"

Cont.

tendered whether in port or not/whether in berth or not/whether in free pratique or not/whether custom cleared or not

Laytime for loading/discharging shall commence 12 hours after NOR tendered unless loading has commenced earlier in which case actual time used to count. Laytime non-reversible.

Time is ceased after completion of loading or discharging provided that there is no delay caused by Charterers/shippers/receivers.

All times lost waiting for berth is to count as laytime except if the vessels occupying berth is delayed due to weather, then time lost during such period(s) is (are) not to count.

Time used for shifting from anchorage to load/discharge berths is not to count.

Time used before commencement of laytime not to count as laytime
The time lost for the following cases/reasons shall not be calculated as laytime:

A.  Legal holidays of the People's Republic of China and Turkey(such as one day for New Year's Day, three days for the Spring Festival, three days for May Day and three days for National Day,bayram holiday etc). Time after 18:00 P.M. on the day before to 08:00 A.M. on the next working day after these holidays shall not be included into laytime, If Saturday and Sunday follows the holidays, laytime shall commence from 08:00A.M. on the next working day.

B.  Bad weather, such as strong wind, storms snows, fog, etc.

C.  Time used for cleaning snow, rain water, etc.

D.  Time used for berth shifting (no more than twice).

E.  Time used for vessel moving from anchorage to waiting berth, from waiting berth to loading berth and vessel preparation for loading.

F.  INAPPLICABLE

G.  Working stop ordered by the government.

H.  Time used for vessel's draft survey before loading.

I.  Force majeure.

J.  Time used for deballasting.

CLAUSE 20
Loading rate 10,000 metric tons per weather working day of 24 consecutive hours Sundays and holidays included, 12 hours turn time unless sooner commenced in which case turn time inapplicable.

2

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN 07 NOVEMBER 2005
M.V. "RM EVERAIM"

# Wonsild & Søn

Cont.

Loading and spout trimming of the cargo shall be free of expense to the Owner.

## CLAUSE 21
Discharging rate 7,000 metric tons  Marmara 5,000 metric tons at Samsun, per weather working day of 24 consecutive hours Sundays and holidays included. 12 hours turn time unless sooner commenced in which case turn time inapplicable.

Discharge port declarable latest on sailing load port.

## CLAUSE 22
Shifting if any  to be for Charterers' account and time to count as laytime at both ends. If ordered by Owners same to be for Owners' account.

During loading operations, if loading is prevented or stopped by vessel, due to insufficient pumping of ballast, time lost not to count as laytime.

## CLAUSE 23
Any taxes on cargo and freight to be for Charterers account, on vessel, crew and flag to be for Owners account.

## CLAUSE 24
Balance freight plus demurrage or minus despatch at discharge port if any to be paid within 15 banking day upon completion of discharging after Owners presentation of related supporting documents even by fax.

## CLAUSE 25
Opening and closing of the hatches whenever required by Charterers, shippers, receivers or stevedores to be done by vessel's crew in Owners expenses provided same is permitted by local regulation, otherwise for Charterers' account. Vessel shall give necessary, power-cranes as on board free of any expense to Charterers' whenever Charterers, shippers, receivers or their servant requires.

## CLAUSE 26
Owners/Master to give regular notices to Charterers/Agents/Receivers/YILMAR Chartering for loading port on fully fixing and thereafter as changes occur and for discharging port 15/10/7/5/3/2/1 days notice to be given

Notice parties:

Yilmar Shipping Ltd, Istanbul
Tel: 90 212 290 3080
Fax: 90 212 290 3081
Tlx: 26046
E-mail: volkan@yilmar.com

Richland International Shipping Agency Ltd.
Century Lungdu International Building Room 802
datum Road, Anhul Beili

ADDITIONAL CLAUSES TO CHARTER PARTY    **Wonsild & Søn**
DATED COPENHAGEN 07 NOVEMBER 2005
M.V. "RM EVERAIM"

Cont.

Borough, Yiyaan No. A16, chaoyang Distric, Beijing
Contact personal: Mr. Wang Mingxian, General Manager
Tel: 86 10 64932810/2275
Fax: 86 10 64932247
Mob: 13801205559

Contat person: Ms Joyce Ju, Deputy General Manager
Tel: 86 10 64932810/2275
Fax: 86 10 649322247
Mob: 13901334469
E-mail: richland@richint.net

Yildirim-Beijing Office
contact person: Mr. Puma Cao Wenquan
E-mail: pumacao@yildirimgroup.com.cn

Discharge port:

Yilmar shipping Ltd., Istanbul
Tel: 90 212 290 3080
Fax: 90 212 290 3081
Tlx: 26046
E-mail: volkan@yilmar.com

## CLAUSE 27
Master to notify stevedores of damages if any, in writing within 24 hours after occurance
except for hidden damage which to be reported immediately upon discovery but latest
upon completion of discharge. Stevedores shall be under the direction and control of the
Master although appointed by the Charterers. Any stevedore damage at loading or
discharging ports shall be settled directly between the Owners and the stevedores. In any
case, the Charterers will assist and remain responsible in finding a solution.

## CLAUSE 28
Owners to have all cargo spaces clean, swept, dry and free of any articles of previous
voyage and must be to satisfaction of Shippers otherwise time lost to be for Owners
account. In case of dispute Owners have right to appoint independent surveyor. Owners
warrant tank tops suitable for grab discharge. In case of any dispute which arise due to
hold cleaning mutually independent survey would be appointed and his finding/decision to
be bind both parties finally.

## CLAUSE 29
No cargo to be stowed in bridge spaces inaccessible to mechanical grabs for loading and
discharging. Any extra expenses incurred in loading by reason of stowage in inaccessible
places to be for account of the vessel, any time lost over and above the usual time
required for grab loading and discharging is not to count as laytime.

4

ADDITIONAL CLAUSES TO CHARTER PARTY      **Wonsild & Søn**
DATED COPENHAGEN 07 NOVEMBER 2005
M.V. "RM EVERAIM"

_____

**CLAUSE 30**
New Jason, New Both-to-Blame Collision Clause, P & I Bunker Deviation Clause, Voywar
1993 and Force Majeure Clause attached hereto are to be considered fully incorporated as
part of this Charter Party. General Average to be settled in London and York Antwerp
Rules 1974 latest amendments to be applied.

**CLAUSE 31**
Should the vessel be required to be shifted to another berth all costs associated with such
a move shall be born by the Charterers and all additional costs incurred in loading at the
alternate berth shall be born by the Charterers.

At discharging port shifting expenses if any to be on Charterers' account.

The time used for shifting between loading/discharging berths is to count. During loading
operation if loading is prevented or stopped by vessel, due to insufficient pumping of
ballast, time lost not to count as laytime.

**CLAUSE 32**
After completion of discharging sweeping by brooms and cleaning of holds to be for the
Owners' expenses and time used not to count.

**CLAUSE 33**
GA/Arbitration in London and English law to apply, each party to appoint their own
arbitrator and in any case of disagreement the matter will be referred to an umpire whose
decision will be final and binding. Should one of the parties neglect or refuse to appoint an
Arbitrator within 20 (twenty) days after receipt of request from other party, the single
Arbitrator appointed shall have the right to decide alone and his decision may be binding
on those parties. The arbitrators and the umpire shall be conversant with shipping matters
and members of the LMAA.

**CLAUSE 34**
The vessel to load and discharge at all hatches simultaneously with her own gear at
regular/reasonable working speed through per hatch however the vessel shall always give
free use of cranes up to their mentioned lifting capacities and to supply all running gears,
falls and runners and other necessary equipment as well as sufficient power day and night
and provide for sufficient light on deck and holds for night works all if/when and where
required free of charge.
Vessel has minimum 30 tons safety lifting capacity. Owners certify that all cranes on board
in good working condition and capable of discharge tonnage as mentioned by their normal
speed. Any time lost by reason defective gears/equipment to breakdown of same to be
added to laytime pro rata to the number of cranes or insufficient power to drive same not to
count as laytime even if vessel is already on demurrage pro rata the number of cranes.
Any crane breakdown to be declared in the statement of facts.

In case of any dispute which arise due to cranes capacity in that case mutually
independent survey to be appointed and his decision/and his finding to be bind on both
parties.

ADDITIONAL CLAUSES TO CHARTER PARTY **Wonsild & Søn**
DATED COPENHAGEN 07 NOVEMBER 2005
M.V. "RM EVERAIM"

---

### CLAUSE 35

Charterers agents are imperative and to be used at discharge port, Owners to pay all port charges at loading and discharging port as usual.

Proforma disbursement amount at loading port which to be fair and reasonable and as per official port tariff will be remitted by Owners directly to loading port agents and Charterers are not responsible for advance payment of this funds. If Owners request from Charterers to pay this funds and Charterers reply in positive way, Charterers will not be responsible for any delay in vessel's sailing or receiving funds.

Proforma disbursement amount at discharge port which to be fair and reasonable and as per official port tariff will be remitted by Owners directly to discharge port agents and Charterers are not responsible for advance payment of this funds.

Owners are entitled to request and confirm agree proforma disbursement account at both ends before stem confirmation. In contrary to this agents will apply their usual proforma disbursement account

Charterers agents at both ends

At load port:
Richland International Shipping Agency Ltd.
Century Lungdu International Building Room 802
datum Road, Anhui Beili
Borough, Yiyaan No. A16, chaoyang Distric, Beijing
Contact personal: Mr. Wang Mingxian, General Manager
Tel: 86 10 64932810/2275
Fax: 86 10 64932247
Mob: 13801205559

Contat person: Ms Joyce Ju, Deputy General Manager
Tel: 86 10 64932810/2275
Fax: 86 10 649322247
Mob: 13901334469
E-mail: richland@richint.net

Discharge port:

Yilmar shipping Ltd., Istanbul
Tel: 90 212 290 3080
Fax: 90 212 290 3081
Tlx: 26046
E-mail: volkan@yilmar.com

### CLAUSE 36

From the date of coming into force of the international safety management (ISM) Code in relation to the vessel and thereafter during of this Charter Party, the Owners shall procure that both the vessel and "the company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code.

www.wonsild.com

ADDITIONAL CLAUSES TO CHARTER PARTY         **Wonsild & Søn**
DATED COPENHAGEN 07 NOVEMBER 2005
M.V. "RM EVERAIM"

Upon request the Owners shall provide a copy of the relevant document of compliance (DOC) and safety management certificate (SMC) to he Charterers.

Except as indicated in this Charter Party, loss, damage, expense or delay caused by the failure on the part of the Owners or "the company" to comply with the ISM Code shall be for Owners' account.

## CLAUSE 37
Overtime for account of the party ordering it, but officers and crew overtime always to be for the account of the vessel. If ordered by Port Authority, cost of same to be on Charterers/shippers/Receivers account.

## CLAUSE 38
Owners to guarantee that vessel complies with all laws and regulations in the trade vessel will be employed in during the duration of this Charter Party and at the ports of call and that vessel have valid certificates required by local and/or international authorities. Owners also guarantee all stability booklets are correct and vessel suitable for the sufficient draft survey.

## CLAUSE 39
Bill of Lading to be issued as "freight payable as per Charter Party" and/or "clean on board" and/or freight prepaid" in Charterers option as per their format. In case of freight prepaid Bills of Lading to be kept under loadport agents custody till Owners instruction of "freight has been irrevocable paid" upon declaring agent to release Bills of Lading immediately. In case of non preparing Bills of Lading till completion of loading then vessel to sail with mate receipts only. In case original Bills of Lading are not available at discharge port at receivers hand, Owners to allow discharge against LOI as per Owners' P and I format, duly signed by Charterers only.

Protective clauses to be included in Bills of Lading: BIMCO ISO/ISM Clause, Y2K Clause, New Jason Clause, New Both-to-Blame Clause, P and I Bunkering Clause, Conwartime Clause and General Clause Paramount.

95% freight payable less commission and estimated load port despatch within 3 banking days after sailing load port in US currency into Owners nominated bank account.

Master has no right to reject any unclean cargo, in case of unclean cargo Charterers to issue LOI on Owners P and I Club format. Master can insert his all remarks into mate receipts only.

Freight deemed earned as cargo loaded on board irrevocable discountless non returnable whether vessel and/or cargo lost or not lost

Load port agent has right to issue/release Bills of Lading always according to Owners' instruction.

Charterers have the right to change the Bills of Lading according to their business/ trading purposes against Charterers/receivers LOI

7

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN 07 NOVEMBER 2005
M.V. "RM EVERAIM"

# Wonsild & Søn

## CLAUSE 40
Draft survey always Charterers' account, but Master has to supervise in all ports. Owners will not be responsible for the weight bridge results at discharge port, but remain responsible for the Bills of Lading quantity has to be delivered with maximum 1% difference according to the draft result both ends.

## CLAUSE 41
Trimming operation will not be carried out and only grab trimming will be performed at loading port.  Grab trimming at loading port will be made under Master's supervision and satisfaction. Master shall convey necessary protest against shippers/agents/servants for the improper trimming and shall keep Charterers informed prior signing Bills of Lading. Otherwise Owners can not claim dead freight or to accept payment according to actual load as per draft survey.

## CLAUSE 42
Strikes or lockouts or any accidents/breakdowns of the appliance or stoppages on railway or at the loading/discharging places and/or river and/or canal due to weather or any other force majeure causes occurring beyond the control of the Charterers/Receivers/Consignees, which may directly affect the cargo(es) for which the vessel's are stemmed or the loading/discharging of the vessel always excluded unless the vessel is already on demurrage. Charterers undertake to advise Owners promptly, in writing, of such instances and also without commitment to indicate the extend in time of such force majeure.

## CLAUSE 43
Charter Party terms shall always supersede Bills of lading terms, whenever contradictory, typewritten clauses or amendments shall principally overrule the printed next of the Gencon Charter Party.

## CLAUSE 44
VESSELS FULL DESCRIPTION AND PARTICULARS:

1. GENERAL
   NAME              : MV RM EVERAIM
   EX NAMES          : NEW BUILDING
   CALL SIGN         : V7GL9
   TYPE              : BULK CARRIER
   FLAG              : MARSHALL ISLANDS
   PORT OF REGISTRY      : MAJURO
   OFFICIAL NO.      : 2127
   CLASSIFICATION SOCIETY : ABS
   CLASS             : +A1,BULK CARRIER,(E),+AMS,+ACCU,PORT,SH
                       GRAB,HCS,SHCM
   BUILT             : 11/2004
   SHIPYARD          : ZHEJIANG, CHINA
   IMO NO.           : 9264130
   INMARSAT M ID (F77)   : TEL: 764087916 FAX: 764087918
   INMARSAT C ID         : 453846238
   SELECTIVE CALL (SC NO.) :
   DSC (MMSI NO.)        : 538002127

8

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN 07 NOVEMBER 2005
M.V. "RM EVERAIM"

# Wonsild & Søn

LOA              : 190 M
LBP              : 182 M
BREADTH MOULDED        : 32.26 M
DEPTH MOULDED         : 17.20 M
HOLDS/HATCHES         : 5
OFFICERS NATIONALITY/NOS.: FILIPINO/8
CREW NATIONALITY/NOS.  : FILIPINO/11

2. MANAGEMENT
    OWNERS          : MARINIC SHIPPING COMPANY
    DISPONENT OWNERS     : T.K.B. SHIPPING A/S
    TECHNICAL MANAGER    : WEM LINES S.A.
    OPERATION MANAGER    : WEM LINES S.A.

3. INSURANCE
    P & I CLUB     : UK P&I (OWNERS) AND
               ASSURANCEFORENINGEN SKULD (DISPONENT OWNERS)
    H + M VALUE    :USD 35 MIO

4. DRAFTS / FREEBOARD/DEADWEIGHT
                 METERS   METERS   MTNS
    SUMMER        : 12.072   5.166   50568.17
    WINTER        : 11.821   5.417   49164.402
    TROPICAL SW    : 12.323   4.915   51975.252
    FWA ON SUMMER DRAFT   : 272 MM
    SUMMER DRAFT TPC     : 56.096 MTS
    CONSTANT :          : 500 MTS
    (:) LUBOILS AND UNPUMPABLE BALLAST INCLUDING, FW EXCLUDING

5. TONNAGE
                 GRT     NRT
    INTERNATIONAL     : 30661   17260
    SUEZ CANAL      : 31575.87  28320.31
    PANAMA CANAL     : 25476.12

6. CARGO COMPARTMENTS
    TYPE OF COATING: TAR FREE EPOXY

| CAPACITY | GRAIN CBM | GRAIN CFT | BALE CBM | BALE CFT |
|---|---|---|---|---|
| HOLD NO. 1 | :10930.23 | 387139.433 | 10383.72 | 367782.515 |
| HOLD NO. 2 | :14022.48 | 496664.293 | 13321.36 | 471831.220 |
| HOLD NO. 3 | :14031.33 | 496977.753 | 13329.76 | 472128.741 |
| HOLD NO. 4 | :14031.33 | 496977.753 | 13329.76 | 472128.741 |
| HOLD NO. 5 | :13166.53 | 466347.273 | 12508.20 | 443029.786 |

| | | | | |
|---|---|---|---|---|
| TOTAL | :66181.90 | 2344106.505 | 62872.80 | 2226901.003 |

| HOLD DIMENSIONS | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| LENGTH (CORRUGATED) | 24.6 | 28.4 | 28.4 | 28.4 | 28 MTRS |
| BREADTH (CENTER) | 31.62 | 31.62 | 31.62 | 31.62 | 31.62 |
| HEIGHT | 15.5 | 15.5 | 15.5 | 15.5 | 15.5 |

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN 07 NOVEMBER 2005
M.V. "RM EVERAIM"

**Wonsild & Søn**

| COAMINGS (INNER) | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| LENGTH | 16.2 | 21.2 | 21.2 | 21.2 | 20.3 MTRS |
| BREADTH | 15.9 | 17.5 | 17.5 | 17.5 | 17.5 |
| HEIGHT (DECK TO TOP) | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 |

| TANKTOPS | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| LENGTH | : 26.2 | 27.8 | 27.8 | 27.8 | 27.0 |
| BREADTH FORE | : 12.2 | 22.4 | 22.4 | 22.4 | 22.4 |
| BREADTH AFT | : 22.4 | 22.4 | 22.4 | 22.4 | 11.2 |

| HATCH COVERS | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| LENGTH | : 16.4 | 21.32 | 21.32 | 21.32 | 20.5 |
| BREADTH | 16.1 | 17.7 | 17.7 | 17.7 | 17.7 |

HATCH COVERS TYPE : MC GREGOR FOLDING TYPE
METHOD OF OPENING  : HYDRAULIC

7. MAX PERMISSIBLE LOADS (MTNS/SQ. M)

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| TANKTOP | : 24 | 24 | 24 | 24 | 24 |
| HATCH COVERS | : 2.44 | 2.44 | 2.44 | 2.44 | 2.44 |
| MAX LOAD (EVENLY) MTNS FOR TANKTOP | | | | | |
| | 14450 | 12100 | 18800 | 12100 | 16700 |

8. COF DANGEROUS GOODS : CARGO HOLDS NO 1&2    CLASS 1.1 TO 9
                         CARGO HOLDS NO 3,4 & 5 CLASS 1.4.S TO 9
                         (CLASS 5.2 DANGEROUS GOODS UNDER DECK IS PROHIBITED)
                         NO 1&2 CARGO HOLDS PROTECTED BY DRENCHING SYSTEM
                         FOR FURTHER DETAILS REFER TO G.D D.O.C

9. CARGO GEARS
      NUMBER OF CRANES  : 4
      TYPE              : SSHS4028
      MANUFACTURER      : TSUJI/JAPAN
      MANUFACTURERS NOS  : 034916/034917/034918/034919
      CRANES' CAPACITY  : 40 TONS X 28 M/R
      OUTREACH (M)      : 28
      MAX RADIUS (M)    : 28 FROM THE CENTER OF ROTATION
      MIN RADIUS (M)    : 4
      HIGHEST HOOK PSN  : 3 M
      HOISTING SPEED    : 17/34 M/MIN
      SLEWING SPEED     : 0.5 AVE RPM
      SLEWING SECTOR    : 360 DEG
      LUFFING TIME      : ABT 65 SEC
      HEEL/TRIM ALLOWED : 5 DEG OR LESS/2 DEG LESS

10. MAIN ENGINE
      TYPE          : MAK 12 VM 43
      MANUFACTURER  : MAK
      DESCRIPTION   : 4-STROKE
      DESIGN        : V-TYPE

10

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN 07 NOVEMBER 2005
M.V. "RM EVERAIM"

**Wonsild & Søn**

---

BORE ? STROKE  : 430MM/610MM
OUTPUT KW/BHP  : 10800KW/14686HP
FUEL GRADE     : IFO 380 CST

11. DIESEL GENERATORS
QUANTITY      : 2
TYPE          : 6 M 20
MANUFACTURER  : MAK
OUTPUT KW/BHP : 1020KW
FUEL GRADE    : IFO 380 CST
GENERATORS    : 2 SETS
         + SHAFT GENERATOR 960KW

12. PROPELLER
TYPE        : C.P.P
RIGHT HAND  : YES
DIAMETER    : 6.0 MTRS
MEAN PITCH  : VARIABLE
MATERIAL    : G-CUAL10NI
WEIGHT      : 1800 KGS/BLADE (7200 KGS 4 BLADES)

13.  BOW THRUSTER   :ROLLS ROYCE KAMEWA-ULSTEIN (1160 HP)

14. EVAPORATOR
DAILY CAPACITY  :ABT 21M3/DAY

15.  SPEED:ABT 14 KNTS IN LADEN AND IN BALLAST CONDITION
BASIS GOOD WEATHER UP TO MAX BF 4/DOUGLAS SEA STATE 3
IFO 380 CST RMG 35 ISO 8217/96/NDAS & 8217/2005(COMING SOON)
MDO DMB ISO 8217/96/NDAS & 8217/2005(COMING SOON).

TESTING AND SAMPLING AS PER DNV FUEL QUALITY PROGRAM

CONSUMPTION
SEA PASSAGE (LOADED): ABT 32,70 MTS IFO WHEN SHAFT GENERATOR
IS OPERATING. IF SHAFT GENERATOR IS NOT WORKING DUE ROUGH SEA
THEN ONE GENERATOR OPERATING PLUS ABT 1.4 MTNS IFO

SEA PASSAGE (BALLAST):ABT 28.6 MTS
IN PORT IDLE      :ABT 1.5/DAY
AT ANCHOR IDLE    :ABT 1.5/DAY
WHEN BOILER WORKING(PORT/ANCHORAGE):ABT 0.84/DAY

CARGO GEAR USING
GEARS WORKING  8 HRS    :ABT 2.5 MTS
GEARS WORKING 16 HRS    :ABT 3.5 MTS
GEARS WORKING 24 HRS    :ABT 4.5 MTS
CONSUMPTION OF MDO      :VESSEL CONSUMES MDO WHEN
                MANOEUVRING IN SHALLOW
                WATERS/RIVERS,ENTERING

11

ADDITIONAL CLAUSES TO CHARTER PARTY        **Wonsild & Søn**
DATED COPENHAGEN 07 NOVEMBER 2005
M.V. "RM EVERAIM"

AND LEAVING PORTS
WATER CONSUMPTION        :ABT 11 MTS/DAY

16. SHIP'S STOCKS (TANK CAPACITY)

IFO        : 2719.33 M3  100%
MDO        :  84.267 M3  100%
FRESH WATER    :  500 M3  100%
BALLAST WATER  : 14761.528 M3 100% HOLD BALLAST NOT INCLUDED
LUBRICANTS    :  141.786 M3
SLUDGE ? BILGE : 33.26 M3/25.0 M3

BUNKERING
POSITION OF STATION(S) : PORT AND STARBOARD SIDE
PIPELINE DIAMETER    : 220 MM O.D/115 MM O.D
MAX PRESSURE      : 4.0 BAR
MAX BUNKERING RATE   : FO 350 M3/HR DO 150M3/HR
TIME REQUIRED FOR FULL
BUNKERING IFO/MDO    : 7.7 HRS/0.56 HR
IFO / MDO SIMULTANEOUS BUNKERING: YES

17. BALLASTING / DEBALLASTING SYSTEM
NUMBER OF PUMPS    : 2
TOTAL PUMPS CAPACITY  : 2400 M3/HR
BALLASTING TIME    : 12 HRS
DEBALLASTING TIME   : 13 HRS + 12 HRS STRIPPING

18. MAIN DISTANCES
HEIGHT OF HATCH COAMINGS (WD TO HATCH TOP)  : 2.10 M
DISTANCE FROM SHIP'S RAILS TO INSIDE OF COAMINGS: 7.40 M
HEIGHT FROM BOTTOM LINE TO TOP OF AERIAL    : 46.30 M
HEIGHT FROM BOTTOM LINE TO TOP OF COAMINGS   : 19.80 M
HEIGHT FROM SUMMER WL TO TOP OF COAMINGS   : 7.70 M
HEIGHT FROM FULL BALLAST WL TO TOP OF COAMINGS : 13.71 M
AIR DRAFT MAX LOAD SUMMER CONDITION    : 34.23 M
AIR DRAFT IN FULL BALLAST CONDITION    : 39.50 M
DISTANCE FROM FORE COAMING OF HATCH NO. 1
TO AFT COAMING OF HATCH NO. 5      :137.80 M
DISTANCE FROM BOW TO FORE COAMING NO. 1   : 19.0 M

19. OTHER EQUIPMENT
MOORING ROPES NOS. / CONDITION : 10 COILS/GOOD CONDITION
WIRE COMBINED ROPES NOS./COND  : NIL
LASHING FOR TIMBER    : NIL
SHOES FOR CONTAINERS    : YES-SHOES FOR 38 TEUS ON DECK
AUSTRALIAN HOLD'S LADDERS FITTED: YES
CO2 FITTED      : YES
GRAIN FITTED .      : YES
ELECTRIC VENTILATION (EMPTY HOLDS) :6 A/C  PER HOUR

www.wonsild.com

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN 07 NOVEMBER 2005
M.V. "RM EVERAIM"

# Wonsild & Søn

ALL ABOVE GIVEN IN GOOD FAITH AND BELIEVE CORRECT WOG.

**CLAUSE 45**
Negotiations and fixture is to be kept strictly private and confidential.

**CLAUSE 46**
Freight:

US$20.00 per metric tons FIOST for Marmara (about 10,000 metric tons)
US$22.00 per metric tons FIOST for Samsun (balance quantity)

Breakdown for cargo for Marmara and Samsun in the Charterers' option between 8.000 metric tons upto maximum 10,000 metric tons in Marmara, balance in Samsun but maximum 40,000 metric tons for Samsun basis 10,50 meter brakish water arrival draft.

\*\*\*\*\*\*\*\*\*\*\*



13

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN 07 NOVEMBER 2005
M.V. "RM EVERAIM"

# Wonsild & Søn

---

## BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party falls to be determined in accordance with the laws of England, the following Clause shall apply:

## NEW BOTH TO BLAME COLLISSION CLAUSE

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the Servants of the Carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or Carrier. The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact".

## NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract, or otherwise, the goods, shippers, consignees, or Owners of the goods shall contribute with the Carrier in General Average to the payment of any sacrifices, losses, or expenses of a General Average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods. If a salving ship is owned or operated by the Carrier, salvage shall be paid for as fully as if such salving ship or ships belonged to strangers. Such deposit as the Carrier or his Agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the Carrier before delivery.

## BIMCO STANDARD WAR RISKS CLAUSE
## FOR VOYAGE CHARTERING, 1993
## CODE NAME: VOYWAR 1993"

(1) For the purpose of this Clause, the words:

(A) A Owners shall include the Shipowners, Bareboat Charterers, Disponent Owners, Managers or other Operators who are charged with the management of the Vessel, and the Master; and

(B) A War Risks shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed

14

ADDITIONAL CLAUSES TO CHARTER PARTY     **Wonsild & Søn**
DATED COPENHAGEN 07 NOVEMBER 2005
M.V. "RM EVERAIM"

selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(2) If at any time before the Vessel commences loading, it appears that, in the reasonable judgement of the Master and/or the Owners, performance of the Contract of Carriage, or any part of it, may expose, or is likely expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, the Owners may give notice to the Charterers cancelling this Contract of Carriage, or may refuse to perform such part of it as may expose, or may be likely expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks; provided always that if this Contract of Carriage provides that loading or discharging is to take place within a range of ports, and at the port or ports nominated by the Charterers the Vessel, her cargo, crew, or other persons onboard the Vessel may be exposed, or may be likely to be exposed, to War Risks, the Owners shall first require the Charterers to nominate any other safe port which lies within the range for loading or discharging, any may only cancel this Contract of Carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement.

3) The Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed or continue on any voyage, or on any port thereof, or to proceed through any canal or waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo (or any part thereof), crew or other persons on board the Vessel (or any one more of them) may be, or are likely to be, exposed to War Risks. If it should so appear, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof, and if within 48 hours of the receipt of such notice, the Charterers shall not have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfilment of the Contract of Carriage. The Owners shall be entitled to recover from the Charterers the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been carried to the discharge port and if the extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight

(4) If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo, crew or other persons on board the Vessel may be, or are likely to be, exposed to War Risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owners shall give notice to the Charterers that this route will be taken. In this event the Owners shall be entitled, if the total extra distance exceeds 100 miles, to additional freight which shall be the same

www.wonsild.com

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN 07 NOVEMBER 2005
M.V. "RM EVERAIM"

# Wonsild & Søn

percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route.

(5) The Vessel shall have liberty:

(A) to comply with all orders, directions, recommendations or advise as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or direction;

(B) to comply with the orders, directions, or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(C) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(D) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(E) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment of sanctions;

(F) where cargo has not been loaded or has been discharged by the Owners under any provisions of this Clause, to load other cargo for the Owners= own benefit and carry it to any other port or ports whatsoever, whether backwards of forwards or in contrary direction to the ordinary or customary route.

(6) If in compliance with any of the provisions of sub-clauses (2) to (5) of this Clause anything is done of not done, such shall not be deemed to be a deviation, but shall be considered as due fulfilment of the Contract of Carriage.

## P. & I. Bunker Deviation Clause, 1948

The vessel in addition to all other liberties shall have liberty as part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever whether such ports are on or off the direct and/or customary route or routes to the ports of loading or discharge named in this Charter and there take oil bunkers in any quantity in the discretion of owners even to the full capacity of fuel tanks, deep tanks, and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.

16

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED COPENHAGEN 07 NOVEMBER 2005
M.V. "RM EVERAIM"

# Wonsild & Søn

## FORCE MAJEURE CLAUSE

The acts of God, public enemies, the restraints of rulers, princes and people, strike or lockouts of crew, pirates, robbers and arrest, fire on land or sea and accident of the sea, river, machinery, boilers, navigation and latent defects in the hull or machinery of whatever nature or kind mutually expected.

Strikes or lockouts of workmen at the mines of shippers factory or railways or barges at the loading or discharging port or elsewhere, war or effects of war, revolution, civil commotion, breakdown on or stoppage of railways or barges, or lighters or the suppliers of cargo, now hereafter under contract, stoppage or destruction of goods in transit, yellow fever or other epidemic, frost, fire, cyclones, tempests, inundation's, earthquakes, unavoidable accidents to machinery or boilers, or other unavoidable hindrances in mining, transporting, loading, discharging or receiving the material or goods, restraints of established authorities and any other causes or hindrances happening without the fault of the Charterers shippers or suppliers of cargo, prevention or delaying or delaying the mining or manufacturing, supplying, loading, discharging or receiving of the cargo are expected and neither Charterers nor shippers shall be liable for any loss or damage resulting from any such excepted causes and time lost by reason thereof shall not count as laydays or days on demurrage. The same shall apply to any delay caused by the ship or crew.

T.K.B. SHIPPING A/S



17

www.wonsild.com

**BILL OF LADING**
TO BE USED WITH CHARTER-PARTIES

B/L NO. .01

Shipper

SHENHUA COAL TRADING COMPANY
NO.22 XIBINHELU, ANDINGMEN,
DONGCHENG DISTRICT, BEIJING
CHINA 100011

Reference No.

Consignee

TO ORDER

Notify address

ETI KROM A.S.
BINGOL KARAYOLU 55.KM
23089 KOVANCILAR-ELAZIG/TURKEY

| Vessel | Port of loading |
| --- | --- |
| RM EVERAIM | XINGANG PORT, CHINA |

Port of discharge
DERINCE OR GEBZE AND/OR SAMSUN/TURKEY

ORIGINAL

Shipper's description of goods                                              Gross weight

N/M          SHENHUA SIZED COAL          IN BULK

SAID TO WEIGH
49098MT

CLEAN ON BOARD   **1 3 NOV 2005**

FREIGHT PAYABLE AS PER CHARTER PARTY

BIMCO ISO/ISM-CLS, Y2K CLS, NEW JASON CLS,
NEW BOTH TO BLAME CLS, PANDI BUNKERING
CLS, CONWARTIME CLS AND GENERAL CLS PARAMOUNT

(of which                    on deck at Shipper's risk; the Carrier not
being responsible for loss or damage howsoever arising)

| | |
| --- | --- |
| Freight payable as per CHARTER-PARTY dated ......... 7TH NOV,2005 | **SHIPPED** at the Port of Loading in apparent good order and condition on board the Vessel for carriage to the Port of Discharge or so near thereto as she may safely get the goods specified above. |
| FREIGHT ADVANCE. Received on account of freight: | Weight, measure, quality, quantity, condition, contents and value unknown. |
| | IN WITNESS whereof the Master or Agent of the said Vessel has signed the number of Bills of Lading indicated below all of this tenor and date, any one of which being accomplished the others shall be void. |
| Time used for loading ......... days ......... hours. | FOR CONDITIONS OF CARRIAGE SEE OVERLEAF |

1 3 NOV 2005

| Freight payable at | Place and date of issue |
| --- | --- |
| | XINGANG PORT,CHINA |
| Number of original Bs/L | 天津北方联合国际船舶代理有限公司 |
| THREE | TIANJIN NORTHERN UNITED INTERNATIONAL SHIPPING AGENCY CO., LTD. |
| | THE MASTER BY EXECUTION |

5   Printed and sold by
Witherby & Company Limited, 32/36 Aylesbury Street,
London EC1R 0ET,
Tel. No. 0171 251 5341   Fax No. 0171 251 1296
by authority of The Baltic and International Maritime Council
(BIMCO) Copenhagen

AS AGENT FOR THE MASTER OF M/V

**EXHIBIT**
B

CODE NAME: "CONGENBILL"
EDITION 1994
ADOPTED BY
THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)

## Conditions of Carriage

**(1)** All terms and conditions, liberties and exceptions of the Charter Party, dated as overleaf, including the Law and Arbitration Clause, are herewith incorporated.

**(2) General Paramount Clause.**

    **(a)** The Hague Rules contained in the International Convention for the Unification of certain rules relating to Bills of Lading, dated Brussels the 25th August 1924 as enacted in the country of shipment, shall apply to this Bill of Lading. When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactments are compulsorily applicable, the terms of the said Convention shall apply.

    **(b)** Trades where Hague-Visby Rules apply.

    In trades where the International Brussels Convention 1924 as amended by the Protocol signed at Brussels on February 23rd 1968 – the Hague-Visby Rules – apply compulsorily, the provisions of the respective legislation shall apply to this Bill of Lading.

    **(c)** The Carrier shall in no case be responsible for loss of or damage to the cargo, howsoever arising prior to loading into and after discharge from the Vessel or while the cargo is in the charge of another Carrier, nor in respect of deck cargo or live animals.

**(3) General Average.**

General Average shall be adjusted, stated and settled according to York-Antwerp Rules 1994, or any subsequent modification thereof, in London unless another place is agreed in the Charter Party.

Cargo's contribution to General Average shall be paid to the Carrier even when such average is the result of a fault, neglect or error of the Master, Pilot or Crew. The Charterers, Shippers and Consignees expressly renounce the Belgian Commercial Code, Part II, Art. 148.

**(4) New Jason Clause.**

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or the owners of the cargo shall contribute with the Carrier in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Carrier, or his agents, may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the Carrier before delivery.

**(5) Both-to-Blame Collision Clause.**

If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo, and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Carrier.

The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

For particulars of cargo, freight, destination, etc., see overleaf.